# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| JAMIE L. BROCK RUSSELL, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:12-CV-115** |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Jamie Brock Russell ("Russell")  appeals to the district court from a final

decision of the Commissioner of Social Security ("Commissioner") denying her application

under the Social Security Act (the "Act") for a period of disability and Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI").[2] (*See* Docket # 1.)  For the

following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Russell applied for SSI and DIB in October 2008, alleging that she became disabled as of

September 21, 2008. (Tr. 151-53, 167-78, 200.)  The Commissioner denied Russell's application

initially and upon reconsideration, and Russell requested an administrative hearing. (Tr. 72-78,

88-98.)  On September 23, 2010, a hearing was conducted by Administrative Law Judge ("ALJ")

---

[1] Although Plaintiff brought this suit against Michael J. Astrue, the former Commissioner of Social
Security, Carolyn W. Colvin became the Acting Commissioner on February 14, 2013. (Docket # 28 at 1 n.1.)  As
such, under Federal Rule of Civil Procedure 25(d), Colvin is automatically substituted as a party in place of Astrue.
FED. R. CIV. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

George Gaffaney, at which Russell and a vocational expert ("VE") testified; also present at the hearing was Russell's non-attorney representative. (Tr. 31-67.) On December 3, 2010, the ALJ rendered an unfavorable decision to Russell, concluding that she was not disabled because she could perform a significant number of jobs in the economy. (Tr. 12-23.) The Appeals Council denied Russell's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-8, 1269-77); 20 C.F.R. §§ 404.981, 416.1481.

Russell filed a complaint with this Court on April 9, 2012, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Russell contends that the ALJ's opinion is materially flawed because he: (1) improperly evaluated the opinion of her treating psychiatrist, Dr. Marshall; (2) improperly discounted the credibility of her symptom testimony; and (3) failed to accommodate her moderate limitations in concentration, persistence, or pace when assigning her residual functional capacity ("RFC") and posing a hypothetical to the VE. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 14-20.)

## II. FACTUAL BACKGROUND[3]

### A. Background

At the time of the ALJ's decision, Russell was thirty years old; had an eighth grade education and was attempting to obtain her GED online; and had held several short-term jobs at a factory, a fast food restaurant, and a nursing home. (Tr. 22, 48, 151, 203, 543.) She alleges disability due to bipolar disorder, post traumatic stress disorder ("PTSD"), anxiety, osteoarthritis, left knee pain status post surgery, left ankle pain status post surgery, migraines, post L4-L5

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 1,277-page administrative record necessary to the decision.

fusion, post laminectomy syndrome, lumbar degenerative disk disease, and obesity. (Opening Br. 2.)

At the hearing, Russell, who was five feet seven inches tall and weighed 264 pounds at the time, testified that she lives with her mother and her three children, ages eight, ten, and eleven. (Tr. 36.)  She last worked as a factory worker in 2008, but her "back and [her] temper" prevent her from working now; she receives food stamps, Medicaid, and child support. (Tr. 36-37, 49.)  She states that she can "barely lift anything," "can barely move at times," and sometimes when she bends over "will fall on [her] face because [her] back just goes out." (Tr. 37.)  She stated that she has lost seventy-six pounds in the past nine months because she gets depressed and does not eat. (Tr. 38, 52.)

As to her daily activities, Russell drives a car, shops, attends her children's activities, helps them with homework, and does some laundry and light cleaning, resting intermittently between activities. (Tr. 39-40, 43.)  Her daughter performs much of the meal preparation, but Russell helps her by making lists and preparing ingredients from a seated position (Tr. 38-39); Russell's mother and children also perform various other household chores, particularly tasks that require bending or lifting (Tr. 40-41).  Russell visits with friends regularly, but feels she has trouble getting along with people due to her irritability. (Tr. 43.)  She complained of depression, crying spells, suicidal thoughts, and difficulty with concentration and memory. (Tr. 43-44, 52-53.)

Russell stated that she has constant, "stabbing" back pain that radiates into her right hip and down her leg and foot. (Tr. 45.)  To control her pain, she uses medication, heat, and ice and lies in a reclined position (Tr. 45); she reports no medication side effects (Tr. 46).  She estimated

that she can walk a half mile, but needs to recline for two hours afterwards; she can stand for ten to fifteen minutes at a time and can climb five steps. (Tr. 41-42, 49-59.)  If she sits "too long," her back pain extends down her legs and they go numb, causing her to "get up and move." (Tr. 41.)  She uses an electric mobilized cart between once a week and once a month depending on whether she takes her pain medicine as instructed. (Tr. 39.)  She also reported difficulty sleeping and that she has migraine headaches twice a week, which typically last five or six hours. (Tr. 51-52.)

*B. Summary of the Medical Evidence*

In November 2007, Russell was assessed by Susan Brumm, a mental health clinician at the Bowen Center. (Tr. 314-16.)  Brumm noted that Russell had received counseling in 1996 for problems with anxiety, depression, anger, and irritability; her history was significant for past trauma, including physical and mental abuse. (Tr. 314.)  Russell also reported a significant history of alcohol and drug abuse, but denied current use. (Tr. 314.)  She told Ms. Brumm that her anger was much better, but that she had some racing thoughts, nightmares, and problems with concentration. (Tr. 314.)  She was diagnosed with PTSD and bipolar I disorder. (Tr. 313.)

In October 2008, the Bowen Center closed Russell's case. (Tr. 313.)  Her attendance was inconsistent, as she had not been seen since January 2008. (Tr. 313.)

On December 8, 2008, Russell was evaluated by Candace Martin, Psy.D. (Tr. 542-47.)  On mental status exam, Russell walked with a slowed gait and stiff posture as a result of a motor vehicle accident two days earlier. (Tr. 544.)  She was sore and distracted by pain throughout the evaluation and was confused about the exact date and her age. (Tr. 544.)  She showed no evidence of thought disorder, but reported ongoing auditory hallucinations involving general

noises and hearing voices. (Tr. 544.)  She demonstrated good eye contact, but her attention and concentration were somewhat limited due to her pain from the auto accident. (Tr. 544.)  Her abstract reasoning and intermediate memory appeared poor, and she demonstrated weak mentation. (Tr. 545.)  Her husband reported that she had severe mood swings. (Tr. 546.)

Dr. Martin determined that Russell was not able to perform to the best of her ability and thus she did not administer the WAIS-III. (Tr. 544.)  She indicated that Russell's performance on the mental status examination reflected that she was somewhat depressed as compared to what one might expect, given her report that she was currently earning B grades in school. (Tr. 545.)  She reportedly functions independently in activities of daily living and is limited only by her back problems, except that her depression causes her to participate less in household chores and social activities. (Tr. 546.)

Dr. Martin found it difficult to determine the extent that Russell's cognitive limitations would limit her ability to work, but as to her psychological issues, Dr. Martin thought that Russell would likely have problems with attendance, performance in unknown situations or around strange or threatening people, and possibly with general cognition due to poor sleep. (Tr. 546.)  Also, depending upon the degree of influence of her hallucinations, she may have difficulty interacting with others and engaging in appropriate levels of focused attention and sustained concentration. (Tr. 546.)  Dr. Martin assigned Russell a Global Assessment Functioning ("GAF") score of 25 and diagnosed her with PTSD, acute stress disorder, major depressive disorder-recurrent, schizophrenia-paranoid type, rule out bipolar disorder, and

polysubstance abuse in remission.[4] (Tr. 546.)

Also in December 2008, Dr. Alan McGee, an orthopaedic surgeon, saw Russell for complaints of low back and right leg pain in the L5 nerve distribution. (Tr. 555-56.) He noted that Vicodin muscle relaxants had not helped her and that she had not received any significant therapy or epidural shots. (Tr. 555.) On physical exam, she had a positive straight leg raise on the right and a positive "Spurling" maneuver for the lumbar spine. (Tr. 555.) An x-ray showed a pars defect of L4 with spondylolisthesis of L4-5, grade one, and an MRI showed degenerative disk disease at L4-5 with herniated nucleus pulposus. (Tr. 555.) Dr. McGee diagnosed Russell with degenerative disk disease of the lumbar spine with spondylolisthesis and herniated nucleus pulposus. (Tr. 555.) They decided to proceed with non-operative therapy, and Dr. McGee referred her to Dr. Karl for steroid injections and other pain management therapy. (Tr. 555-56.) Dr. McGee wrote that if conservative management was unsuccessful, he would consider performing a surgical fusion of L4-5. (Tr. 555-56.)

In January 2009, Russell was evaluated by Dr. Donald Marshall, a psychiatrist, for complaints of anxiety, irritability, depression, fluctuating energy level, and erratic sleep and appetite. (Tr. 563-64.) Upon mental status exam, Russell was fully oriented and had a depressed mood, but displayed no evidence of suicidal ideation or obsessive compulsive behaviors. (Tr. 564.) Dr. Marshall noted that she had racing thoughts, but that her speech was logical and goal

---

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.*

directed. (Tr. 465.)  He prescribed three medications. (Tr. 563.)  She returned in February, stating that she felt "jittery" on the new medications and asked to try Abilify, which Dr. Marshall then prescribed. (Tr. 596.)

Also in January 2009, Dr. H.M. Bacchus performed a physical exam at the request of Social Security. (Tr. 566-67.)  He observed that Russell's gait was mildly antalgic and slightly slower, but fairly sustainable; she favored her left lower extremity. (Tr. 567.)  She had some tenderness to palpation and range of motion of her left knee and ankle. (Tr. 567.)  Her muscle strength and tone were normal in all extremities, except her left lower leg was 4/5. (Tr. 567.)  He diagnosed her with degenerative disk disease and spinal stenosis of the lumbar spine per history; status post right renal stent secondary to renal failure, which appeared stable; depression/anxiety; bipolar PTSD per history; osteoarthritis; left knee and ankle pain status post surgery; and ulcers and migraines per history. (Tr. 567.)  Dr. Bacchus concluded that Russell retained the physical functional capacity to perform at least light duties that allow for frequent position changes. (Tr. 567.)

Later that same month, Dr. J. Sands, a state agency physician, reviewed Russell's record and concluded that she could lift and carry ten pounds frequently and twenty pounds occasionally; stand or walk up to six hours in an eight-hour workday; sit about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, and crawl; and occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. (Tr. 569-76.)

On February 4, 2009, William Shipley, Ph.D., a state agency psychologist, reviewed Russell's record and completed a psychiatric technique form indicating that Russell had moderate limitations in maintaining concentration, persistence, or pace and mild limitations in

activities of daily living and maintaining social functioning. (Tr. 577-90.)  He also indicated on a

mental RFC assessment that she was moderately limited in her ability to maintain attention and

concentration for extended periods, work in coordination with or proximity to others without

distraction, complete a normal workday or work week without interruptions from

psychologically-based symptoms, and perform at a consistent pace without an unreasonable

number and length of rest periods. (Tr. 591-92.)

In addition, Dr. Shipley criticized the GAF score of 25 assigned by Dr. Martin,

emphasizing that Dr. Martin did not describe any severe limitations in her clinical findings and

that Russell performed a wide range of tasks without difficulty, including preparing breakfast

and getting her children off to school, doing laundry and dishes, and helping with school

activities on a weekly basis, including girl scouts and cheerleading. (Tr. 593.)  He thought that

Russell's attention and concentration were moderately limited and that she appeared to have the

cognition and concentration necessary to complete tasks. (Tr. 593.)  He further opined that she

could make work-related decisions, remember locations and work-like procedures, and was

capable of maintaining a schedule. (Tr. 593.)  Dr. Shipley thought that Russell was not credible,

noting that her reports of psychotic symptoms were not objectively or subjectively supported.

(Tr. 593.)  Dr. Shipley's opinion was later affirmed by a second state agency psychologist, Dr.

Unversaw. (Tr. 21.)

By March 2009, Dr. McGee concluded that Russell's symptoms were not improving with

conservative treatment, and thus he performed the surgical L4-5 discectomy, decompression, and

fusion. (Tr. 649-53.)  After surgery, Russell continued pain management therapies with Dr.

Thomas and Dr. Karl. (Tr. 603, 635, 637, 654, 758, 981, 984, 986, 991, 993, 1001, 1008, 1012-

13, 1016-19, 1023, 1026, 1028.)

In May 2009, Russell returned to Dr. Marshall, reporting feeling anxious and that she thought she was hearing things. (Tr. 596.) Dr. Marshall observed that Russell's mood appeared in the normal range. (Tr. 596.) He adjusted her medications. (Tr. 596.)

In August 2009, Russell was examined by Dr. Bilal Khan at the request of the state agency. (Tr. 942-44.) On physical exam, she was severely tender to palpation of the lumbar spine and demonstrated reduced range of motion. (Tr. 943.) Her gait was slow and appeared painful; she could not squat or rise from a squatted position. (Tr. 944.) His clinical impression was that she had multiple co-morbidities and a minimal quality of life. (Tr. 944.)

On October 19, 2009, Russell saw Dr. Marshall, reporting that she was going through a divorce and was frequently crying, shaking, and experiencing suicidal thoughts. (Tr. 996.) Dr. Marshall adjusted her medications and completed an affective disorders questionnaire, checking the boxes for the following symptoms: anhedonia or pervasive lost of interest in almost all activities, appetite disturbance with weight change, sleep disturbance, difficulty concentrating or thinking, thoughts of suicide, and hallucinations/delusions or paranoid thinking. (Tr. 967-69.) Dr. Marshall indicated on the questionnaire that Russell had "moderate" limitations in activities of daily living and "marked" limitations in maintaining social functioning and concentration, persistence, or pace. (Tr. 967.)

Near that same time, Dr. Marshall also completed a mental RFC assessment for Russell. (Tr. 968-69.) There, Dr. Marshall indicated that Russell had only "slight" or "moderate" limitations in the various mental categories. Specifically, he wrote that Russell had a slight limitation in her ability to understand, remember, and carry out very short and simple

instructions; perform activities within a schedule, maintain attendance, and be punctual; sustain an ordinary routine without special supervision; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. (Tr. 968-69.) Dr. Marshall indicated that Russell had moderate limitations in the ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without distraction; make simple work-related decisions; complete a normal workday and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make realistic plans independently of others. (Tr. 968-69.)

In April 2010, Russell told Dr. Marshall that she had stopped taking her Lyrica after developing suicidal ideation. (Tr. 1010.) She continued to have "bad" anxiety, but was working out at the YMCA. (Tr. 1010.) She told Dr. Marshall in August that her depression and anxiety had worsened, reporting sleeping problems, diarrhea, irritability, and suicidal thoughts. (Tr. 1042.)

Also in August 2010, Russell returned to Dr. Karl at Orthopaedics Northeast for reevaluation of the constant throbbing pain in her lumbar spine, which she rated as a seven or eight on a ten-point scale. (Tr. 1264-66.) She said that it worsens with activity and is relieved

with rest; she was not experiencing any numbness or tingling. (Tr. 1264.)  Her motor exam was normal except for 4/5 strength in her right lower extremity and reduced sensation posteriorly, her spinal range of motion was limited by lumbar pain, and a straight leg raising test was positive on the right. (Tr. 1265.)  An MRI showed post L4-5 fusion with stable post operative change and no evidence of disk protrusion. (Tr. 1265.)  Dr. Karl listed diagnoses of lumbar degenerative disk disease, post laminectomy syndrome, and lumbar radiculitis; he ordered a psychological evaluation and discussed trial spinal cord stimulation. (Tr. 1265.)

In September 2010, Russell was evaluated by Dr. Roger Thomas at Orthopaedics Northeast. (Tr. 1260-61.)  She complained of constant throbbing back pain at level seven or eight, stating that it had "moderately worsened" and was better with rest and worse with activity. (Tr. 1260.)  A physical examination revealed a normal gait, full non-tender range of motion in the lower extremities, full range of motion of the spine, a negative straight leg raising test bilaterally, and negative "Faber" and "Spurling" tests. (Tr. 1261.)  Dr. Thomas prescribed Vicodin and scheduled to see her in two months. (Tr. 1261.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by

substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On December 3, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 12-23.) He noted at step one that Russell had not engaged in substantial gainful activity after her alleged onset date and at step two that she had the following severe impairments: degenerative disk disease, bipolar disorder, schizophrenia, depression, anxiety, and PTSD. (Tr. 13-14.) At step three, the ALJ determined that Russell's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 16.)

Before proceeding to step four, the ALJ determined that Russell's symptom testimony was not reliable to the extent it was inconsistent with the following RFC:

> The claimant has the residual functional capacity to perform light work . . ., except that: the claimant can walk up to one-half mile at a time. The claimant can never climb ladders, ropes and scaffolds, and just occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. The claimant should have only occasional exposure to hazards, such as heights and moving parts. The claimant is able to do simple, routine tasks, can only occasionally adapt to change in a

---

[5] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

routine work setting and can have only occasional interaction with the public.

Tr. 18.)  Russell had no past relevant work to consider at step four. (Tr. 22.)  Based on this RFC

and the VE's testimony, the ALJ found at step five that Russell could perform a significant

number of light work jobs within the economy, including security guard, packer, food prep

worker, and courier. (Tr. 22-23.)  Accordingly, Russell's claims for DIB and SSI were denied.

(Tr. 23.)

*C.  The ALJ's Consideration of Dr. Marshall's Opinion Is Supported by Substantial Evidence*

Russell first contends that the ALJ erred in assigning some or little weight to the opinion

of Dr. Marshall, her treating psychiatrist.  To review, Dr. Marshall completed a check-the-box

affective disorders questionnaire in October 2009, indicating that Russell had "moderate"

restrictions in activities of daily living and "marked" difficulties in maintaining social

functioning and persistence, concentration, or pace; near that same time, however, Dr. Marshall

completed a check-the-box mental RFC assessment reflecting that Russell had just "slight" or

"moderate" limitations in various categories of social interaction, understanding and memory,

and concentration and persistence. (Tr. 967-69.)  Ultimately, because of this inconsistency, the

ALJ's discounting of Dr. Marshall's opinion is supported by substantial evidence.

To review, the Seventh Circuit Court of Appeals has stated that "more weight is

generally given to the opinion of a treating physician because of [her] greater familiarity with the

claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2).  However, this principle is not absolute, as "a treating physician's

opinion regarding the nature and severity of a medical condition is [only] entitled to controlling

weight if it is well supported by medical findings and not inconsistent with other substantial

evidence in the record." *Clifford*, 227 F.3d at 870; *see also Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) to determine the proper weight to give the opinion.[6]

Furthermore, a claimant "is not entitled to DIB [or SSI] simply because [her] treating physician states that [she] is 'unable to work' or 'disabled.'" *Clifford*, 227 F.3d at 870. Rather, the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); SSR 96-5p, 1996 WL 374183, at *2. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2; *see Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006); 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

Here, the ALJ thoroughly considered Dr. Marshall's medical records, including his October 2009 affective disorders questionnaire and mental RFC assessment identifying the limitations described above. In fact, the ALJ penned not less than two paragraphs discussing Dr. Marshall's opinion and progress notes. (*See* Tr. 21.) Nonetheless, the ALJ ultimately discounted the conflicting limitations articulated by Dr. Marshall, choosing to assign "little" weight to the

---

[6] These factors include: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); 20 C.F.R. §§ 404.1527(c), 416.927(c).

affective disorders questionnaire and "some" weight to the mental RFC assessment. (Tr. 21.)

The ALJ also assigned "some" weight to the opinions of Dr. Shipley, the reviewing state agency

psychologist, and Dr. Martin, the examining state agency psychologist. (Tr. 21); *see generally*

*Dixon*, 270 F.3d at 1177 (acknowledging that a consulting physician's opinion may offer "the

advantages of both impartiality and expertise"); *Smith v. Apfel*, 231 F.3d 433, 442-43 (7th Cir.

2000) (emphasizing that a consulting physician may bring expertise and knowledge of similar

cases).

The ALJ explained that he discounted Dr. Marshall's opinion because he found it

internally inconsistent.  More particularly, the ALJ observed that Dr. Marshall indicated on the

affective disorders questionnaire that Russell had "marked" difficulties in maintaining social

functioning and maintaining concentration, persistence, or pace, but identified on the mental

RFC assessment that she had just "slight" or "moderate" limitations in these areas. (Tr. 21;

*compare* Tr. 967, *with* Tr. 968-69.)  Because of this internal inconsistency, Dr. Marshall's

opinion is not entitled to controlling weight. *See Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th

Cir. 2004).  Therefore, Russell essentially contends that the ALJ erred when weighing the factors

articulated in 20 C.F.R. §§ 404.1527(c) and 416.927(c), urging that such factors favor assigning

more weight to the portion of Dr. Marshall's opinion that identified "marked" limitations.

But when considering Dr. Marshall's opinion, the ALJ explained that he discounted it for

two reasons, both of which hold up under scrutiny. *See generally Scott v. Astrue*, 647 F.3d 734,

739 (7th Cir. 2011) ("An ALJ must offer good reasons for discounting the opinion of a treating

physician." (citations and internal quotation marks omitted)).  First, as explained above, the ALJ

found that Dr. Marshall's opinion was internally inconsistent. (Tr. 21); *see* 20 C.F.R. §§

404.1627(c), 416.927(c) ("Generally, the more consistent an opinion is with the record as whole, the more weight we will give to that opinion."). Second, he noted that Dr. Marshall's opinion of "marked" limitations was not supported by his own treatment notes. (Tr. 21); *see* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").

Russell nitpicks these two reasons provided by the ALJ. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). She first attempts to downplay the internal inconsistency in Dr. Marshall's October 2009 reports, contending that the VE testified that even a "moderate" limitation in attention and concentration would prevent her from performing full-time competitive work. (*See* Tr. 64-66.)

But as discussed *infra*, the ALJ *also* relied upon the opinion of Dr. Shipley, who stated that despite moderate limitations in concentration, persistence, or pace, Russell retained the concentration necessary to complete tasks, make work-related decisions, remember locations and work-like procedures, and maintain a schedule. (*See* Tr. 21, 593.) The ALJ then accommodated Russell's limitations in attention and concentration when assigning her an RFC for "simple, routine tasks" that required only occasional adaption to changes in the routine work setting and occasional interaction with the public. (Tr. 18.) "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); *see Flener v.*

*Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation.");

*Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004) (same).

Russell also challenges the second reason that the ALJ provided for discounting Dr. Marshall's opinion—that his articulation of "marked" limitations in the affective disorders questionnaire "is not supported by treating records." (Tr. 21.)  She points out that Dr. Marshall documented her subjective complaints at his initial evaluation in January 2009, including that she would clean for two weeks nonstop but then have to go to bed for a day or two, felt "depressed often" and "very edgy," and complained of "a lot of anxiety." (Tr. 563.)  Dr. Marshall also documented in May 2009 Russell's report that "she hears things," felt "more edgy," and complained of "bad anxiety" (Tr. 569), and in October 2009 (when Russell was going through a divorce) that she was "crying a lot," "shaking," and had "[s]ome suicidal thoughts" (Tr. 966).

Although Dr. Marshall did note Russell's description of her various complaints, his progress notes typically consisted of only a few lines and included very few objective clinical findings.  For example, at Russell's initial evaluation in January 2009, his clinical findings included that she was oriented times three; had a fluctuating mood; demonstrated logical goal-directed speech; had racing thoughts but no desire to harm herself; and experienced erratic sleep and appetite. (Tr. 564.)  Similarly, in May 2009, his clinical findings reflected that Russell's mood appeared in the euthymic (normal) range. (Tr. 966.)  Significantly, Dr. Marshall did not explain the "marked" limitations on the affective disorders questionnaire or support these severe limitations with clinical findings, and thus the ALJ looked to Dr. Marshall's treatment notes for

support.  After doing so, the ALJ determined that the treatment notes were inadequate to support a finding of "marked" deficits and, on this record, the ALJ's conclusion is reasonable. *See, e.g.*, *Morris v. Astrue*, No. 1:09-cv-99, 2010 WL 403360, at *8 (N.D. Ind. Jan. 27, 2010) (discounting severe restrictions penned by a treating physician in his medical source statement where they were not reflected in his treatment notes) (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007))); *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527, 416.927.

In any event, as explained *supra*, the determination of a claimant's RFC is an issue reserved to the Commissioner, 20 C.F.R. §§ 404.1527(d), 416.927(d), and "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance," SSR 96-5p, 1996 WL 374183, at *2; *see generally Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").  Thus, despite Russell's plea to the contrary, the ALJ is under no obligation to afford Dr. Marshall's opinion of "marked" restrictions a significant amount of weight.

And, insofar as the consulting and state agency physicians' opinions conflict with Dr. Marshall's October 2009 opinion of marked limitations, the ALJ is required to weigh conflicting evidence, ultimately deciding which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (deeming unconvincing the claimant's complaint that the ALJ gave greater weight to an earlier mental examination than to one conducted later and concluding that "[w]eighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do").  The Court cannot accept Russell's invitation to  substitute its judgment for the Commissioner concerning the weight to

apply to Dr. Marshall's October 2009 affective disorders questionnaire. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence"); *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993) ("We must affirm the ALJ's decision if his findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may also support [the claimant's] claim.").

In sum, the ALJ's rationale for discounting Dr. Marshall's opinion is traceable and adequately supported. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)). Accordingly, Russell's challenge to the ALJ's consideration of Dr. Marshall's opinion does not merit a remand of the Commissioner's final decision.

### D. The ALJ's Credibility Determination Will Not Be Disturbed

Next, Russell challenges the ALJ's credibility determination, contending that the ALJ erred by merely offering "boilerplate" language without any explanation as to why her assertions of disabling symptoms were not credible. The ALJ's credibility determination, however, withstands scrutiny.

When making his credibility determination, the ALJ did indeed recite the template language similar to that criticized by the Seventh Circuit in *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012), and *Martinez v. Astrue*, 630 F.3d 693, 696-97 (7th Cir. 2011). That is, the ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [assigned] residual functional capacity assessment." (Tr. 19.)  Russell argues that the "conclusory nature of the credibility finding is not supported by substantial evidence . . . ." (Br. in Supp. 19.)

But as the Seventh Circuit explained in *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012), "[i]f the ALJ has otherwise explained his [credibility] conclusion adequately, the inclusion of [the template] language can be harmless."  Here, when reading the decision as a whole, which the Court is required to do, *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (unpublished) (explaining that "tidy packaging" is not required in an ALJ's decision, as the court reads it "as a whole and with common sense"), the ALJ adequately supported his credibility determination with specific findings.

In that regard, in the paragraphs immediately following the template language, the ALJ observed that the objective medical evidence did not necessarily support the severity of Russell's complaints.  For example, he noted that although Russell complained of pain at a level seven or eight to Dr. Thomas in September 2010, his examination revealed full spinal range of motion, a negative straight leg raising test bilaterally, normal gait, and full non-tender lower extremity range of motion. (Tr. 19-20.)  The ALJ also found Russell's purported intermittent need to use a motorized cart because she just "can't move" or "fall[s] on [her] face because [her] back just goes out" (Tr. 37) not particularly consistent with Dr. Thomas's physical examination findings. (Tr. 19.)  In addition, the ALJ considered that both Dr. Bacchus and Dr. Sands opined that despite her back problems causing a mildly antalgic and slowed gait and some postural limitations, Russell still had the physical capacity to perform light work. (Tr. 20 (citing Tr. 567,

570 ).)  "[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility." *Smith*, 231 F.3d at 439; *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record.").  "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c)).

The ALJ also thought that Russell's activities of daily living—specifically, her ability to attend online GED classes, perform household chores, drive a car, shop, and care for her children—also undercut her claim of disability. (Tr. 17, 19-21.)  For example, the ALJ noted that Russell complained of attention, concentration, and memory problems in that she would forget whether she performed self care and could not concentrate when someone was talking, yet she was taking online GED classes and earning B grades. (Tr. 20.)  He also observed that Russell told Dr. Martin that her activities of daily living were limited only by her back problems. (Tr. 17, 546.)  An ALJ is entitled to consider a claimant's performance of daily activities as a factor in his credibility assessment, *see Schmidt*, 395 F.3d at 746-67; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p, 1996 WL 374186, at *3, and any inconsistent statements by the claimant, SSR 96-7p, 1996 WL 374186, at *3 ("The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances.").

Furthermore, the ALJ did indeed credit Russell's symptom testimony in part, acknowledging that her degenerative disk disease and various mental health diagnoses were severe impairments.

Accordingly, to accommodate her limitations arising from these conditions, the ALJ restricted Russell to walking no more than one-half mile at a time—the distance that she walks when escorting her children to school—and performing just occasional postural movements. (Tr. 18, 41-42.) To accommodate her mental limitations, as explained earlier, the ALJ limited Russell to simple, repetitive tasks that require her to only occasionally adapt to changes in the work setting and occasionally interact with the public. (Tr. 18); *see, e.g.*, *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. Mar. 3, 2008) (affirming the ALJ's credibility determination where he discredited the claimant's symptom testimony only in part).

Therefore, regardless of the inclusion of "boilerplate" language, the ALJ adequately considered the credibility of Russell's symptom testimony in accordance with the factors identified in 20 C.F.R. §§ 404.1529(c) and 416.929(c) and ultimately determined that her symptoms were not of disabling severity. In doing so, the ALJ sufficiently built an accurate and logical bridge between the evidence and his conclusion, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Accordingly, the ALJ's credibility determination will be given the special deference it is due. *Powers*, 207 F.3d at 435.

   *E. The RFC and the ALJ's Step Five Finding Are Supported by Substantial Evidence*

Finally, Russell contends that the ALJ erred when assigning her RFC and posing a hypothetical to the VE at step five, asserting that the ALJ failed to account for her moderate deficiencies in maintaining concentration, persistence, or pace. Russell's argument is ultimately unpersuasive.

At steps two and three of the sequential evaluation, the ALJ determines the severity of a

claimant's mental impairment by assessing her degree of functional limitation in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. SSR 96-8p, 1996 WL 374184, at *4.  Relevant to this appeal, the "paragraph B" criteria consist of four "broad functional areas":  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3); *see, e.g.*, *Jones v. Massanari*, No. 01-C-0024-C, 2001 WL 34382025, at *13 (W.D. Wis. Oct. 18, 2001).  "[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4.

"The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C . . . ." *Id*.; *see Virden v. Astrue*, No. 11-0189-DRH-CJP, 2011 WL 5877233, at *9 (S.D. Ind. Nov. 4, 2011).  "RFC is what an individual can still do despite his or her limitations." SSR 96-8p, 1996 WL 374184, at *2; *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  "The RFC assessment must be based on *all* of the relevant evidence in the case record." SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original); *see* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  That is, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 WL 374184, at *5; *see Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012).

Here, when assessing the "paragraph B" criteria at steps two and three, the ALJ concluded that Russell had "moderate" difficulties in maintaining social functioning and concentration,

persistence, or pace, and mild deficits in activities of daily living. (Tr. 22.)  Then, accounting for these limitations in the RFC, the ALJ stated: "The claimant is able to do simple, routine tasks, can only occasionally adapt to change in a routine work setting and can have only occasional interaction with the public." (Tr. 18.)

Contrary to Russell's assertion, the ALJ adequately accounted for her deficiencies in maintaining concentration, persistence, or pace by assigning her this limitation in the RFC, which the ALJ then incorporated into the hypothetical posed to the VE. (*See* Tr. 61-62.)  This is because the RFC is supported by the opinion of Dr. Shipley (later affirmed by Dr. Unversaw), to which the ALJ assigned some weight. (Tr. 593.)  To review, Dr. Shipley considered Russell's record and concluded that although she had moderate difficulties in the ability to maintain attention and concentration for extended periods, work in coordination with or proximity to others without distraction, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods, she was "not significantly limited" in the remaining seventeen mental-activity categories. (Tr. 591-92.)  Accordingly, Dr. Shipley concluded that Russell "appear[s] to have the cognitive abilities and concentration necessary to complete tasks . . . make work related decisions, remember locations and remember work like procedures[,] and . . . is capable of maintaining a schedule." (Tr. 593.)

The instant circumstances are analogous to the facts confronting the Seventh Circuit in *Johansen*, 314 F.3d at 288-89.  There, the ALJ determined that the claimant was moderately limited in his ability to maintain a regular schedule and attendance and in his ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms.

*Id.* In posing a hypothetical to the VE, the ALJ relied upon the opinion of a consulting physician who stated that because the claimant was not significantly limited in seventeen of twenty work-related areas of mental functioning, he retained the mental RFC to perform "low-stress, repetitive work." *Id.* The Court of Appeals concluded that the ALJ's limitation to low-stress, repetitive work adequately incorporated Johansen's moderate mental limitations, articulating that the consulting physician had essentially "translated [his] findings into a specific RFC assessment, concluding that Johansen could still perform low-stress, repetitive work." *Id.*; *see also Milliken v. Astrue,* 397 F. App'x 218, 221-22 (7th Cir. 2010) (unpublished) (affirming ALJ's step five finding where a medical expert opined that despite claimant's difficulties in social functioning and concentration, persistence, or pace, she could still perform unskilled work).

Here, like the consulting physician in *Johansen*, Dr. Shipley "translated [his] findings into a specific RFC assessment."[7] 314 F.3d at 288. The ALJ then relied on Dr. Shipley's translation to some extent when he assigned Russell an even *more* conservative RFC limiting her to simple, routine tasks that require only occasional adaptation to change in a routine work setting and occasional interaction with the public. (Tr. 18.)

To reiterate, an ALJ "is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at

_____

[7] Although Russell cites *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 617-18 (7th Cir. 2010), in challenging the RFC and the step five hypothetical, the facts at hand are distinguishable from those presented in *O'Connor*. There, the ALJ failed to incorporate all of the mental limitations assigned in the RFC into the hypothetical posed to the VE at step five. *Id.* Here, the hypothetical posed by the ALJ to the VE at step five adequately reflects all of the limitations assigned in the RFC. (*Compare* Tr. 61-62, *with* Tr. 18.)

*4 (W.D. Wis. Mar. 2, 2005); *see Johansen*, 314 F.3d at 289 ("All that is required is that the hypothetical question [to the VE] be supported by the medical evidence in the record." (quoting *Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987))). Here, the record, in particular, Dr. Shipley's opinion, adequately supports the RFC assigned by the ALJ, and thus substantial evidence supports the ALJ's step-five finding. As a result, Russell's final argument—that the RFC and the hypothetical posed to the ALJ at step five did not account for her moderate difficulties in concentration, persistence, or pace—does not warrant a remand of the Commissioner's final decision.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Russell.

SO ORDERED.

Enter for this 27th day of June, 2013.

S/Roger B. Cosbey\
Roger B. Cosbey,\
United States Magistrate Judge